**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**


**CIVIL ACTION NO. 2009-017 (WOB)**

**THOMAS CLARKSON**                                                      **PLAINTIFF**

**VS.**                              **MEMORANDUM OPINION AND ORDER**

**SHERRI'S INC.**                                                        **DEFENDANTS**
**d/b/a NIGHT MOVES, ET AL.**


On October 22, 2010, this matter came before the court for oral argument on motions for summary judgment by Defendant, Sherri's Inc. (d/b/a Night Moves) (Doc. #39), and Defendants, Mason County, Jailer Gerald Curtis, and Deputy Jailer John Hickerson (Doc. #40). Defendant John Kerley, a bouncer at Night Moves, has not made a motion for summary judgment. Also before the court was Plaintiff's motion for extension of time under Rule 6(b). (Doc. #53).

Charles Lester represented the Plaintiff. Jeffrey Mando and Claire Parsons represented Defendants, Mason County, Jailer Gerald Curtis, and Deputy Jailer John Hickerson. Paul Boggs represented Defendant Sherri's Inc. (d/b/a Night Moves). Debra Rigg represented the bouncer, Defendant John Kerley. Official court reporter Joan Averdick recorded the proceedings.


*Introduction*

This is a case involving a mix of federal and state law

claims.  The court has jurisdiction over all of Plaintiff's claims pursuant to 28 U.S.C. § 1331, 1332, 1343 and 1367.

Plaintiff's claims involve two sets of facts occurring at two different locations over the course of the same evening.  In summary, Plaintiff was first involved in an altercation with a bouncer at the bar Night Moves, during which Plaintiff sustained injuries.  Police were called and Plaintiff was arrested and taken to the county jail.  Plaintiff contends that his constitutional rights were violated while he was in jail, when a deputy jailer used pepper spray on him, thus giving rise to Plaintiff's 42 U.S.C. § 1983 claim.

Due to the factual complexities involved in the case, the court's reasoning is set out on an individual basis for each Defendant, in chronological order of their contact with Plaintiff.  All reasonable inferences have been made, and all the evidence has been viewed, in the light most favorable to Plaintiff as the non-moving party.

The court's analysis concludes the following:

1) That the bouncer at the bar Night Moves was, as a matter of law, an employee of the bar.

2) That the bouncer's conduct was, as a matter of law, within the scope of his employment.

3) That the bar's liability for the bouncer's conduct is a question of fact for a jury, as is that of the bouncer himself.

4) That the deputy jailer's conduct was not a clear violation of constitutional law and, therefore, he is entitled to qualified immunity.

## *FACTUAL BACKGROUND*

On the evening of September 13, 2008, Plaintiff Thomas Clarkson, along with his sister, brother, and some friends, visited a bar/nightclub called Night Moves. Night Moves is owned and operated by Defendant Sherri's, Incorporated and is located in Maysville, Kentucky.

While at Night Moves, Plaintiff consumed about eight beers and between one and ten shots of alcohol. Plaintiff was intoxicated from the amount of alcohol that he had consumed.

At some point during the course of the evening, Plaintiff's brother was involved in an argument with another patron at an adjoining table. As a result, Plaintiff was physically removed from the premises by a bouncer at the club. The bouncer was Defendant John Kerley.

Once outside in the parking lot of Night Moves, Plaintiff and the bouncer exchanged words. Plaintiff admits he spit on the bouncer at least once. At some point, the bouncer punched Plaintiff on the right side of his face. The bouncer testified Plaintiff was charging at him; Plaintiff testified that he was blind-sided by a punch from the bouncer when he was trying to get

into a car and leave.

Shortly after the bouncer struck Plaintiff, the police arrived on the scene. Plaintiff was arrested and charged with alcohol intoxication and resisting arrest. Plaintiff was initially taken by the police to the Mason County Detention Center, but then was subsequently transported to Meadowview Regional Medical Center by ambulance. At the hospital, Plaintiff was examined by medical professionals, given a CAT scan, diagnosed with a facial fracture, and released.

Plaintiff's after-care instructions warned him that he should expect pain and swelling around the fracture and directed him to seek follow-up care with his referral physician. Plaintiff was then taken back to the jail. Upon being booked into the jail, Plaintiff complained of being in pain, although he did not specify where he was hurting. Plaintiff maintains that he did not have an opportunity to ask to see a doctor or for medical treatment as he was being booked into the jail.

While Plaintiff was in a holding cell, he kicked the door to the cell several times. Plaintiff's sister, who had also been arrested as a result of the fracas at Night Moves, was in an adjoining cell at the jail and recalls Plaintiff kicking the door to his jail cell and screaming loudly. Plaintiff admits to kicking the door, and shouting profanities while in the holding cell.

As a result of his unruly behavior, Plaintiff was warned by jail personnel to stop banging on the jail cell door.  Though he has no memory of being ordered to stop the kicking and yelling, Plaintiff admits it was possible he was warned, as the Deputy Jailer testifies.  Plaintiff continued to make a disturbance and a Deputy Jailer, John Hickerson, responded by deploying one burst of pepper spray to Plaintiff's face while he was in his jail cell.

According to Plaintiff, the pepper spray burned his face, neck, and eyes badly, and caused him to scream in pain.  Plaintiff estimates that he was left in his cell for approximately fifteen to twenty minutes before he was allowed to wash the pepper spray residue off of his face.  Jail records indicate that Plaintiff was sprayed at 3:05 a.m. and was put in the shower between 3:15 AM and 3:25 AM in order to wash off the pepper spray.

After the shower, Plaintiff was placed in a different cell and allowed to go to sleep.  Plaintiff does not recall asking the jail staff for medical attention after being placed in a different jail cell.

Several hours later, Plaintiff was bailed out of jail by his stepfather, and was taken to a hospital where he received further treatment for his injuries.

Plaintiff subsequently filed suit, alleging, among other

things, violation of his civil rights under 42 U.S.C. § 1983.
During the course of the instant litigation, one of the
Defendants, the deputy jailer who sprayed Plaintiff with pepper
spray, was tragically killed in an automobile accident.
Defendants filed a notice of suggestion of the deputy jailer's
death, pursuant to Fed. R. Civ. P. 25, on December 8, 2009.
(Doc. #27). Plaintiff did not make a motion to substitute for
the deceased Defendant within the ninety-day period of time
allowed for under Rule 25. Neither did Plaintiff make a motion
for extension of time within that ninety-day period. Instead,
Plaintiff filed a motion for an extension of time, pursuant to
Fed. R. Civ. P. 6(b), asserting "excusable neglect." (Doc. #53).

Plaintiff's motion for an extension of time was filed on
August 3, 2010, and is now before the court. The bar, Night
Moves, and Defendants, Mason County, Jailer Gerald Curtis, and
Deputy Jailer John Hickerson, have filed their respective motions
for summary judgment. (Docs. #39, #40). The bouncer, Defendant
John Kerley, did not file a motion for summary judgment.

### ANALYSIS

**I.   Summary Judgment**

Summary judgment is warranted where "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  "In considering a motion for summary
judgment, [the court] view[s] the factual evidence and draw[s]
all reasonable inferences in favor of the non-moving party."
*Dominguez v. Correctional Med. Services*, 555 F.3d 543, 549 (6th
Cir. 2009) (citation omitted).  "A mere scintilla of evidence is
insufficient; there must be evidence on which the jury could
reasonably find for the [non-movant]." *Id.* (internal quotations
and citation omitted).


## II.  *Bouncer - John Kerley*

As a result of a blow struck by the bouncer, Plaintiff
suffered a severe facial fracture.  Plaintiff has since brought a
claim against both the bouncer and his alleged employer, the bar
Night Moves.

Despite the bar's argument to the contrary, the court finds
that the bouncer was an employee of Night Moves, as a matter of
law.

The first step in the analysis of whether an individual is
an employee or independent contractor is whether the underlying
facts are in dispute or not.  "Where the facts are in dispute and
the evidence is contradictory or conflicting, the question of
agency, like other questions of fact, is to be determined by a
jury.  However, where the facts [regarding the parties'

relationship] are undisputed, the question becomes one of law for the court."  *Nazar v. Branham*, 291 S.W.3d 599, 606 (Ky. 2009) (citing *Wolford v. Scott Nickels Bus Co.*, 257 S.W.2d 594, 595 (Ky. 1953)).  *Accord Uninsured Employers' Fund v. Garland*, 508 S.W.2d 116, 117 (Ky. 1991).

From the parties' arguments, there does not appear to be dispute over the underlying facts.  The disagreement is whether there existed an employer-employee relationship between the bar and the bouncer.

The factors generally considered in determining whether a master-servant relationship exists are enunciated in *Sam Horne Motor & Implement Co. v. Gregg*, and are as follows:

    (a) the extent of control which, by the agreement, the master may exercise over the details of the work;

    (b) whether or not the one employed is engaged in a distinct occupation or business;

    (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

    (d) the skill required in the particular occupation;

    (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

    (f) the length of time for which the person is employed;

    (g) the method of payment, whether by the time or by the job;

    (h) whether or not the work is a part of the regular

business of the employer; and

> (I) whether or not the parties believe they are
> creating the relationship of master and servant.

279 S.W.2d. 755, 756 (Ky. 1955).

These nine criteria seem to have become further distilled

into a four-factored analysis.

> The proper legal analysis consists of several tests . .
> . and requires consideration of at least four
> predominant factors: (1) the nature of the work as
> related to the business generally carried on by the
> alleged employer; (2) the extent of control exercised
> by the alleged employer; (3) the professional skill of
> the alleged employee; and (4) the true intent of the
> parties.

*Garland*, 805 S.W.2d at 119.  *See also Sweet v. Slusher*, 2009 WL

792547, at *2 (Ky. Ct. App., Nov. 18, 2009) (unpublished).

The Kentucky Supreme Court has gone on to hold that, "[t]he

right to control is considered the most critical element in

determining the principal's liability for the tortious acts of an

agent."  *Brooks v. Grams*, Inc., 289 S.W.3d 208, 212 (Ky. App.

2008) (citations omitted) *and Nazar*, 291 S.W.3d at 607.

Under any analysis, the bouncer is an employee of the bar

Night Moves.  The nature of the work performed by the bouncer was

integrally related to the business generally carried on by the

bar.  The bouncer would perform security duties for the bar on

the weekends.  (Doc. #44, p. 18, 91).  Weekends would presumably

be the busiest and most profitable time of operation for the bar.

The bouncer stated that he was typically contacted on short

notice to "fill-in." (Id. at p. 32, 91). Clearly, by "filling-in," the bouncer was standing in the shoes of some other employee of Night Moves as the need arose.

The extent of control exercised by the bar was high enough to find that an employer-employee relationship existed. The bouncer was hired by the bar's owner. (Id. at p.18). The bouncer was typically contacted either by the owner or the bar manager when asked to "fill in." (Id. at p.32). From his deposition, the communications between the bouncer and the bar were unilateral; Night Moves always called the bouncer to come and work.

Admittedly, the bouncer was under no obligation to show up when asked to work. (Id. at p.91). He was not on the payroll and did not consider himself an employee. (Id. at p.91-92). However, the bouncer does admit to receiving special instructions at times on who to let into the establishment.

> *Q: You're pretty much your own boss; is that fair to say?*
>
> *A: Every once in a while, they would tell - - if somebody called in and asked how old you had to be to get in there or whatever, they would say they have two or three 20-year-olds they would like to get in, you know, just because -- I don't know what the reason would be, but they would say that. So he would be like, be on the look out for three or four young girls coming in here. They tried to call to see if they could come in without drinking or they're going to be with their parents or stuff like that. Steve or Jeff. Jeff's not always there either.*

(Id. at p.92). Since checking identification and controlling access appear to be a major part of the bouncer's duties, the bar's ability to instruct him on who to let into the establishment cements the relationship between the bouncer and the bar as one of master and servant.

The next question then is whether the bouncer's conduct, punching Plaintiff and fracturing his face, was within the scope of his employment. Again, as a matter of law, the court finds that the bouncer was indeed acting within the scope of his employment.

"[I]n general, ... the master is held liable for any intentional tort committed by the servant where its purpose, however misguided, is wholly or in part to further the master's business." *Papa John's Intern., Inc. v. McCoy*, 244 S.W.3d 44, 52 (Ky. 2008) (citation omitted). "The test of the master's responsibility is not the motive of the servant, but whether that which he did was something his employment contemplated, and something which, if he should do it lawfully, he might do in the employer's name." *Dennert v. Dee*, 215 S.W.2d 575, 578 (Ky. 1948) (citation omitted).

The bouncer's own testimony clearly indicates that he was furthering the bar's business in ejecting Plaintiff and monitoring him in the parking lot afterwards.

> *Q: You called 911 when you went back –*

> *A:    Yeah, when he spit at me the first time --*
> *what I said was I'll give him that one time, and I did,*
> *but I walked inside and called 911 when he spit at me.*
>
> *.  .  .  .*
>
> *Q:    Is there a reason why you and Duane stayed*
> *outside?*
>
> *A:    We like to see them get off the property.*
> *Like if they're going to stand out there and wait on*
> *us, get a weapon and come back at us.  That is why we*
> *like to actually see them drive away.  But sometimes we*
> *talk to people and they calm down, and if they're too*
> *intoxicated, we'll call them a cab.  Say, you know,*
> *we'll get you a cab.  It ain't nothing personal, you*
> *can't come back here but I'll get you a cab out of*
> *here.  There's no use getting a DUI.*

(Id. at p.51-52).

There has been much judicial scrutiny of whether an employee, authorized to use force by his employer, remains within the scope of his employment upon the exercise of such force.  The cases overwhelmingly favor a finding of that employee to be within the scope of his employment.

> A principle which seems to have been recognized in a
> number of cases is that the master's responsibility for
> an assault committed by his servant upon a customer,
> patron, or other invitee may arise solely because the
> employment is of such nature as to contemplate the use
> of force.  Generally, it would appear that where an
> employee's duties involve the preservation of peace and
> order upon the premises, or the protection of the
> employer's property from theft or vandalism, an
> inference arises that force, to a reasonable extent,
> may or is expected to be used in the fulfillment of the
> duties of the employment, and hence, the use of such
> force is within the scope of the employment.

C.S. Patrinelis, Annotation, *Liability of Employer, Other Than Carrier, for a Personal Assault Upon Customer, Patron, or Other*

*Invitee*, 34 A.L.R.2d 372, § 14 (1954).

The bouncer's conduct is, as a matter of law, within the scope of his employment. As a result, Defendant Sherri's Inc.'s (d/b/a Night Moves) motion for summary judgment is **DENIED.**

### III. *Deputy Jailer John Hickerson*

Before the court can scrutinize this Defendant's conduct, it must first take up the matter of his untimely demise and Plaintiff's failure to move to substitute within the requisite time period under Fed. R. Civ. P. 25.

Rule 25 states in part,

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Defendant's Notice of Suggestion of Death of Deputy Jailer John Hickerson was filed on December 8, 2009. (Doc. #27). Plaintiff did not move to substitute another party for the deceased Defendant prior to the expiration of the ninety-day window of time under Rule 25. Instead, Plaintiff now moves under Rule 6(b) for an enlargement of time in which to file a motion for substitution.

Although not explicitly stated, Rule 25 does contemplate the enlargement of time under Rule 6(b), as evidenced by the Advisory

13

Committee Notes of 1963.

> The amended rule establishes a time limit for the
> motion to substitute based not upon the time of the
> death, but rather upon the time information of the
> death is provided by means of a suggestion of death
> upon the record, i.e. service of a statement of the
> fact of the death. . . . The motion may not be made
> later than 90 days after the service of the statement
> unless the period is extended pursuant to Rule 6(b), as
> amended.  See the Advisory Committee's Note to amended
> Rule 6(b).

According to the Advisory Committee Notes of 1963 for Rule 6(b),

the extension of time under Rule 25 is at the court's discretion.

The exercise of the court's discretion is based upon a

finding of "excusable neglect."  The test for "excusable neglect"

is as follows:

> [T]he governing legal standard for excusable-neglect
> determinations is a balancing of five principal
> factors: (1) the danger of prejudice to the nonmoving
> party, (2) the length of the delay and its potential
> impact on judicial proceedings, (3) the reason for the
> delay, (4) whether the delay was within the reasonable
> control of the moving party, and (5) whether the
> late-filing party acted in good faith.

*Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir.

2006) (*citing Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.

P'ship*, 507 U.S. 380 (1993)).

A good example of the application of the five factors can be

found in *CCA Global Partners, Inc. v. Carpetmax Flooring Ctr.*,

2006 U.S. Dist. LEXIS 85109 (W.D. Ky., Nov. 16, 2006).  The court

in *CCA Global Partners* applied the five-factor test to the facts

before it but did not do so equally.  "[A]t least two Courts of

Appeal have held that these five factors do not carry equal weight and that the third - the reason for the delay - is the most important." *Id.* at *5.

In the instant case, the reasons for the delay in filing the motion for substitution were that no estate was opened for the deceased defendant deputy jailer and that the notice of suggestion of death did not list an appropriate person/entity to be substituted. Thus, Plaintiff was at a loss to determine who the proper party to be substituted should have been. All other factors being equal, this one tilts in favor of Plaintiff.

After considering Plaintiff's arguments, both in his brief and at oral argument, the court finds that there was excusable neglect. Plaintiff's motion for extension of time to move for substitution shall be **GRANTED**.

Next, there is the matter of the civil rights claim against the deputy jailer in his personal capacity. As such, the defense of qualified immunity must be examined as "a public official sued in his or her individual capacity may still be shielded from suit under the doctrine. . . ." *See Jerauld ex rel. Robinson v. Carl*, No. 06-05, 2009 WL 749781, at *6 (E.D. Ky. Mar. 19, 2009), *Pearson v. Callahan*, 129 S. Ct. 808 (2009), *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), *and Groh v. Ramirez*, 540 U.S. 551 (2004).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their

conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have

known.'" *Pearson*, 129 S. Ct. at 815 (quoting *Harlow*, 457 U.S. at

818). "The protection of qualified immunity applies regardless

of whether the government official's error is 'a mistake of law,

a mistake of fact, or a mistake based on mixed questions of law

and fact.'" Id. (quoting *Groh*, 540 U.S. at 567) (Kennedy, J.,

dissenting).

The defense of qualified immunity requires a "two-part,

sequential analysis." *Comstock v. McCrary*, 273 F.3d 693, 702

(6th Cir. 2001).

> [F]irst, we must determine whether the plaintiff has
> alleged facts which, when taken in a light most
> favorable to [him], show that the defendant-official's
> conduct violated a constitutionally protected right; if
> we answer the first question in the affirmative, we
> must then determine whether that right was clearly
> established such that a reasonable official, at the
> time the act was committed, would have understood that
> his behavior violated that right.

*Id.* (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).

Fortunately, the Supreme Court in *Pearson* granted trial

courts the discretion to analyze the second step of qualified

immunity under *Comstock* without having to decide whether the

first criteria has been met. As such, the court will apply that

approach here.

A review of the law at the time of the deputy jailer's use

of pepper spray indicates that he would be entitled to the

defense of qualified immunity.  The law was not so well established that the deputy jailer was on notice that his conduct, under the circumstances with which he was confronted, was a clear constitutional violation.

In *Cabaniss v. City of Riverside*, the Sixth Circuit found that, "the use of pepper spray is proper, including where a detainee is unsecured, acting violently, and posing a threat to himself or others."  231 Fed. Appx. 407, 413 (6th Cir. 2007).

Other courts have repeatedly upheld the use of mace or pepper spray as a legitimate means of maintaining order and discipline within the prison environment.  *See Combs v. Wilkinson*, 315 F.3d 548 (6th Cir. 2002), *Danley v. Allen*, 540 F.3d 1298 (11th Cir. 2008), *and Jones v. Shield*, 207 F.3d 491 (8th Cir. 2000).

In the instant case, Plaintiff was being extremely disruptive.  Plaintiff's shouting and kicking of the jail cell door were loud enough to be heard by his sister in the adjoining cell.  Plaintiff cannot recall how much alcohol he had consumed in the hours prior to his arrest and detention.  Plaintiff was warned about his conduct prior to the use of pepper spray.  It is reasonable to believe that Plaintiff's continued unruly behavior could have resulted in injury to himself.

Based on the circumstances and the prevailing law at the time, the deputy jailer's conduct was not so unreasonable that he

would have known that deploying a burst of pepper spray upon Plaintiff might later be considered to be a constitutional violation.  Therefore, summary judgment in favor of Deputy Jailer John Hickerson shall be **GRANTED**.

### *IV.  Mason County, Kentucky*

In a footnote in his response brief, Plaintiff, "concedes the County's motion to dismiss."  (Doc. #52, n.1).  At oral argument, Plaintiff stated on the record that he was no longer pursuing a claim against Mason County.  Based on Plaintiff's stated desire to abandon his claim against this Defendant, summary judgment in favor of Mason County will be **GRANTED**.

### *V.   Jailer Gerald Curtis*

At oral argument, Plaintiff conceded that there was not enough of a factual basis to continue pursuing his claim against the Jailer.  Based on Plaintiff's stated desire to abandon his claim against this Defendant, summary judgment in favor of Jailer Gerald Curtis, in both his official and personal capacity, shall be **GRANTED**.

Therefore, having reviewed this matter, and the court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1) Defendant Sherri's Inc. (d/b/a Night Moves), motion for summary judgment (Doc. #39) be, and it hereby is, **DENIED**;

(2) Plaintiff's motion for extension of time under Fed. R. Civ. P. 6(b) (Doc. #53) be, and it hereby is, **GRANTED.** Plaintiff shall file his motion for substitution upon suggestion of death within **ninety days** of the entry of this order;

(3) Motion of Defendants, Mason County, Jailer Gerald Curtis, and Deputy Jailer John Hickerson, for summary judgment (Doc. #40) be, and it hereby is, **GRANTED**, with respect to Plaintiff's federal law claims, and all federal claims be, and are hereby, **DISMISSED WITH PREJUDICE**;

(4) The court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims against Defendants, Mason County, Jailer Gerald Curtis, and Deputy Jailer John Hickerson, under 28 U.S.C. § 1367(c)(3), and those claims be, and are hereby, **DISMISSED WITHOUT PREJUDICE;**

(5) The court exercises its supplemental jurisdiction over Plaintiff's state law claims against Defendant Sherri's Inc. (d/b/a Night Moves) and Defendant John Kerley, under 28 U.S.C. § 1367(a);

(6) This matter is set for Final Pretrial Conference on **Tuesday, March 1, 2011 at 1:00 p.m.**, and the parties are directed to comply with the Final Pretrial Conference Order concurrently entered herewith; and

     (7) This matter is set for Trial, by jury, on **Monday, March 7, 2011 at 10:00 a.m.**

     This 27th day of October, 2010.



Signed By:

*William O. Bertelsman*

United States District Judge

TIC: 38 min.